UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| H.M., as next friend of E.M., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:05-CV-273 |
| | ) | |
| KINGSPORT CITY SCHOOLS | ) | |
| BOARD OF EDUCATION, | ) | |
| EARL LOVELACE, and | ) | |
| CHRIS HAMPTON, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM**

Now before the court is defendants' motion for summary judgment [doc. 36]. Plaintiff has responded, and defendants have submitted a reply. For the reasons that follow, summary judgment will be granted as to the claims affected by the motion, and those counts will be dismissed. Plaintiff's claims not impacted by the present motion will remain set for trial.

I.

*The Parties*

A. Plaintiff

E.M. was a student from the autumn of 2004 through the autumn of 2005 at Dobyns-Bennett High School ("Dobyns-Bennett") in Kingsport, Tennessee. H.M. is E.M.'s father and brings this suit as his next friend. Both H.M. and E.M. are Muslims of Lebanese

descent. They will be referred to herein by their individual initials where relevant in the court's factual narrative and analysis but will be otherwise collectively termed "plaintiff."

B. Defendant

Defendant Kingsport City Schools Board of Education ("the Board") administers Dobyns-Bennett. At all times relevant to this lawsuit, defendant Earl Lovelace was Dobyns-Bennett's principal, and defendant Chris Hampton was an assistant principal at the school.

The complaint is silent as to whether Lovelace and Hampton are sued in their official capacities, their individual capacities, or both. In the defense brief in support of summary judgment, Lovelace and Hampton express the understanding that they have been sued only in their official capacities: "Mr. Lovelace and Mr. Hampton have been sued as a collective defendant along with the Kingsport City School Board of Education. They are therefore sued in their official capacities." [Doc. 37, p. 13]. This distinction is relevant because suit against the principals in their official capacities is the same as a suit against the Board, whereas individual capacity claims would expose Lovelace and Hampton to individual liability for money damages. *See, e.g., Doe v. Claiborne County*, 103 F.3d 495, 509 (6th Cir. 1996).

The court applies a "course of proceedings" test, looking both at the complaint and at subsequent filings, to determine the capacity in which a defendant has been sued. *See Moore v. City of Harriman*, 272 F.3d 769, 772-74 (6th Cir. 2001). "[W]hile it is clearly

2

preferable that plaintiffs explicitly state whether a defendant is sued in his or her individual capacity, . . . failure to do so is not fatal if the course of proceedings otherwise indicates that the defendant received sufficient notice." *Id.* at 772 (citation and quotation omitted). In some manner, "§ 1983 plaintiffs must *clearly* notify any defendants of their intent to seek individual liability." *Id.* at 775 (emphasis added).

Applying the course of proceedings test, the court concludes that plaintiff has sued Lovelace and Hampton in their official capacities only. The complaint and plaintiff's subsequent filings are silent on the issue of individual liability. The complaint generally refers to the defendants collectively as "Defendant" throughout. The complaint employs official capacity lexicon, with plaintiff contending that "[t]he actions of Defendant were taken as state actors and under color of state law, custom, usage and practice." By contrast, *Moore* instructs that defendants can be placed on notice that they are being sued individually through allegations of, for example, "acting for themselves" or "act[ing] outside the scope of their employment and in bad faith." *Id.* at 772-73.

Further, as noted, the defense summary judgment brief expresses Lovelace and Hampton's understanding that they have been sued only in their official capacities. Plaintiff's summary judgment response does not disagree with that position, nor does plaintiff even address it. In fact, the summary judgment response begins, "This Honorable Court should deny the *Defendant's* Motion for Summary Judgment . . . ," and concludes by repeating the complaint's allegation that "the Defendants" acted "under color of state law,

3

as a state actor, and pursuant to custom, usage and practice." [Doc. 44, p.1, 19] (emphasis added).

The principals alternatively argue, "If it should be found that Defendants Lovelace and Hampton have not been sued in their official capacities as they contend, they are protected from suit by qualified immunity." The raising of a qualified immunity defense can suggest that a defendant has been adequately notified that he is being sued in his individual capacity, but it is not alone dispositive of the question. *See, e.g., Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003). In the present case, it is evident that Lovelace and Hampton have merely raised the issue of qualified immunity as a precaution.

Nowhere in the course of the proceedings in this case has plaintiff clearly notified Lovelace and Hampton of the intent to seek individual liability. The court accordingly concludes that the principals have been sued in their official capacities only, which is the same as suing the Board. *See Doe*, 103 F.3d at 509. Accordingly, except where relevant in the court's analysis or factual narrative, all defendants will hereinafter be collectively referred to as "defendant."

II.

*Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

4
Case 2:05-cv-00273   Document 48   Filed 09/10/09   Page 4 of 18   PageID #: 279

56(c). The moving party may discharge its burden by demonstrating that its opponent has failed to establish an essential element of that party's case for which it bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In order to defeat a motion for summary judgment, the non-moving party must present significantly probative evidence in support of its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255.

"It is well settled that the non-moving party must cite specific portions of the record in opposition to a motion for summary judgment, and that the court is not required to search the record for some piece of evidence which might stave off summary judgment." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997). A party responding to a summary judgment motion "*must . . .* set out *specific facts* showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2) (emphasis added).

The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law, *Liberty Lobby* at 251-52, but at summary judgment it is not the court's role to weigh evidence or to determine credibility. *See id.* at

5

255. Nonetheless, "evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue." 10A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727 (3d ed. 1998).

III.

*Background*

Plaintiff's complaint alleges harassment and disparate treatment on the basis of race, national origin, and religion. The complaint contains seven counts: (I) discrimination in violation of Title VI, 42 U.S.C. § 2000d; (II) discrimination in violation of 42 U.S.C. § 1981; (III) discrimination in violation of 42 U.S.C. § 1983; (IV) intentional infliction of emotional distress; (V) negligent infliction of emotional distress; (VI) retaliation in violation of 42 U.S.C. § 1981; and (VII) retaliation in violation of 42 U.S.C. § 1983.

The complaint and the parties' subsequent briefing discuss several allegedly discriminatory events. Viewing the facts thus far presented by the parties in the light most favorable to plaintiff, those events are as follows.

A. <u>Football Game</u>

In late August or early September 2004, E.M. attended a Dobyns-Bennett football game. Another student ("C.E.") reported to Hampton that "[E.M.] and his friends were going to beat me up." Hampton made E.M., but no other student, leave the game. Hampton notified H.M. of the incident by phone. H.M. testified in his deposition that Hampton was "hysterical" during the phone call.

6

B. Death Threat

Also in late August or early September 2004, at a football game and/or in class, students (including C.E.) told E.M.'s then-girlfriend, "If you don't break up with [E.M.] we're going to kill him." Hampton testified that he interviewed the students involved and determined the situation to be "a back-and-forth squabble between 14-year-olds . . . both parties using inappropriate language towards each other."[1] Plaintiff contends that Hampton did not sufficiently follow up on this incident because he did not generate a contemporaneous written report or contact one of the student's parents due to an inactive home phone number. Regardless, plaintiff cites no evidence that the death threats continued after Hampton's investigation.

C. Key Ring

E.M.'s mother found a set of school keys in E.M.'s backpack. H.M. returned the keys to the school and told Hampton that someone was trying to "set up" E.M. Although by affidavit E.M.'s friend Z.J. states that "[w]ith regard to the key ring incident, the school did go after E.M.," E.M. testified that no school official pursued the matter with him at all.[2]

---

[1] Hampton further testified that no student was disciplined, including E.M., because all parties agreed that the harassment was not one-sided and because there was no violence. In its summary judgment briefing, defendant cites pages 12 and 125 of E.M.'s deposition testimony as proof that E.M. was admittedly responsible in part for the conflict because he called another student "a gay." However: (1) page 12 of E.M.'s deposition discusses only topics such as home address and type of car driven; (2) page 125 has not been submitted to the court; and (3) the court's review of the evidence before it finds no such affirmative admission by E.M. or H.M.

[2] In another example of the inaccurate summary judgment briefing presented to the court, (continued...)

7

D. Broken Screen

In the fall of 2004, E.M. went on an overnight out-of-town trip with the school orchestra. He stayed in a hotel room with three other boys. The boys were accused by teachers Bader and Ross of damaging a window screen in the hotel room. According to E.M., school personnel called only his parents regarding this incident. E.M. testified that there were no further overnight trips and that he never heard anything more about the issue from any school personnel. Plaintiff contends that "[a]gents of Defendant . . . picked E.M. out and discriminated against him . . . because of his religious beliefs."

E. Drug Search

In March 2005, a Dobyns-Bennett teacher overheard students saying that another student whose name began with "E" and who owned or was wearing a leather jacket was selling marijuana at school. Based on the limited description, Hampton suspected that "E" could be E.M. After discreetly excusing him from class, Hampton and another Dobyns-Bennett official escorted E.M. to an office where they briefly patted him down and searched his pockets and shoes. No drugs were found, and E.M. was not disciplined in any way. E.M. testified that he was embarrassed by the incident, although the only other student who knew of the event was Z.J., who E.M. himself told about the search.

---

[2](...continued)
defendant cites page 46 of E.M.'s deposition as evidence that E.M. admitted to having stolen the keys. However: (1) page 46 contains no discussion of the key ring incident; (2) the court's review of the evidence before it finds no such admission; and (3) E.M. instead testified that he did not know how the keys ended up in his backpack.

Following this incident, H.M. temporarily withdrew E.M. from school. H.M. complains that Hampton should have instead searched "8 or 12" random students so as not to embarrass any one child. In his deposition testimony, H.M. further complained,

> Now I don't know if Mr. Hampton been [sic] through the police academy, I don't know if he's been through drug school, but how would he know what drugs look like?
>
> . . .
>
> He said, "I know you're going to be upset, I know you're not going to like it." I said, "Did you find anything on my son?" He said, "No." I said, "You know what? I think you made a mistake," and I hang [sic] up the phone and I said, "I'll be picking my son immediately [sic] from school and he will no longer go to that school."

Plaintiff "argues this would not have happened if [E.M.] were not an Arab Muslim."

### F. Soccer

E.M. was a member of Dobyns-Bennett's junior varsity soccer team. He was the only child not allowed to play in the first two games of the season by Coach McCloskey. E.M. also claims that McCloskey treated him more harshly than other players. As a result, E.M. quit the team and claims that he was told by others that McCloskey made a derogatory comment in front of the team when he learned that E.M. had quit.

H.M. complained about the alleged comment. In response, the team members were gathered together and presented with a questionnaire by the school. The questionnaire asked each player to describe: (1) "Comments, if any, I heard Coach McCloskey make at soccer practice on April 11, 2005 [sic] when told that [E.M.] had quit the team"; and (2)

9

"Any other comments/references made by Coach McCloskey in reference to [E.M.]."

With only two exceptions, the team denied hearing any negative remark. The two exceptions were E.M.'s friends Z.J. ("After 3 months of praying, my prayers are finally answerred [sic]. A lil' late but I'll take it.") and C.S. ("I heard Coach McCloskey say that he was going to go to church on Sunday he said [sic] 'Thank God I'm going to church on Sunday.'"). C.S. and Z.J. both state that they were pressured *by other players* not to answer the questions truthfully. However, neither player reports that they were untruthful in their responses. Z.J. additionally states that "immediately after the questionnaire, Chris Hampton pulled me into like a separate little office that was just outside the classroom right after all the seniors talked to me; the next day I was told to give up my jersey." Z.J. does not specify what Hampton talked to him about, or who told him to give up his jersey.[3]

H.M. again complained in an email addressed to Hampton, R. Kitzmiller, M. Billingsley, and E. Lvelare, who apparently are employed in some unidentified capacity by the school system. H.M. stated,

> Today the soccer coach instructed a player to call the student who told the truth during the questioning yesterday and was told to turn his Jersey [sic] in due to [sic] the events from yesterday. Again the school exposed the students, **again the school covered it up really fast to protect the coach.** . . .
>
> The school continues in my opinion to target my son, Specifically [sic] the Principle [sic] approach [sic] my son and asked him if he has been intimidated by anyone, and my son responded no just few [sic] dirty looks from students.

---

[3] Hampton did not read the questionnaires. He counted them, as did Lovelace, and then delivered them to the assistant superintendent and the city attorney. Lovelace does not recall that any further action was taken by anyone based on the questionnaires.

10

> the [sic] Principle [sic] stated to my son "Why am I getting calls from everyone telling me you are being intimidated". [sic] I met with the Principle [sic] and Mr Hampton today and again I raised the issue with regard to my son [sic] safety. I will no longer deal with the school administration anymore since their approach is to downplay the action by the coach and downplay everything that happened to my son.

[Doc. 44, ex. F] (emphasis in original).

Plaintiff characterizes McCloskey's comment and actions as motivated by E.M.'s race and religion. H.M.'s deposition testimony, however, belies that contention. In approximately 2003, there were disagreements between H.M. and McCloskey when each worked with a children's soccer league. H.M. sent at least one letter of complaint to McCloskey, and he characterized McCloskey's response as "outrageous to me." Later in that same time period, H.M. filed a complaint against McCloskey with the "National Soccer Association." H.M. testified that McCloskey thought H.M. was encouraging children to switch from McCloskey's team to another, and that in response McCloskey wrote an email to the parents involved with the new team indicating that their children's "[Dobyns-Bennett] soccer future will be affected. You get what I mean." By H.M.'s own admission, "I filed a complaint against him for threatening children [sic] future. Whether Mr. McCloskey cashed on the threat with my son [by treating him harshly at Dobyns-Bennett], I don't know."

### G. "Brothers Killing Americans"

H.M. testified that, according to E.M., after E.M. returned to school in the spring of 2005, "that's when Mr. Hampton start [sic] chasing him around the school. He was having kids approaching him telling him 'Your brothers in Iraq are – your – your brother in

Iraq are [sic] killing American [sic]. Let's go fight in the back of the school.'"

### H. Other Comments by Students

By his affidavit, C.S. states, "While at Dobyn-Bennet [sic] High School, I heard many derogatory comments about E.M. being Muslim. . . . The environment in Kingsport forced me to keep quiet about the comments I heard other students say about E.M. and his being Muslim." By his affidavit, Z.J. states, "A lot of students at Dobyns-Bennett made comments about E.M. being Arab. . . . Kingsport is a very white town . . . ."

### I. Board Meeting

H.M. testified that he spoke at the June 2005 Board meeting for ten minutes. According to H.M., "I believe and I found that they really didn't want to listen to me, they really didn't want to – they really didn't care in my opinion." H.M's deposition testimony evidences only that he addressed the issues of the drug search and Coach McCloskey at the Board meeting. [H.M. dep., p.74].

### J. 2005-2006 School Year

On August 31, 2005, H.M. again emailed Hampton and other school system personnel. H.M. accused Hampton of

> approach[ing] students who were sitting with [E.M.] during lunch, immediately after [E.M.] left the table. Specifically yesterday you waited until my son got up while eating his lunch then you approached another student who was sitting with him and suspended him. I am not questioning the suspension of another student, what I am concerned with is your timing. The impression that you are giving is that if you sit with [E.M.] you are going to get in trouble or we are watching you. In my opinion that is a direct result of your attempt to intimidate my son. . . .

12

> [E.M.] has continued to receive many negative feedback and invitations to fight with other students . . . . [I]n my opinion you are trying to push [E.M.] out of school by intimidating him directly or indirectly.
>
> I will schedule a meeting with the superintendent in the near future to discuss the new issues . . . .

E.M.'s version of this episode is that "a couple of times [Hampton] would get onto my friends about dress code," but E.M. was unable to recall the name of either student and he admittedly had no knowledge of whether the discipline was related to their association with him. It is unknown whether H.M. met with "the superintendent" as anticipated in his August 31, 2005 email. The instant lawsuit was filed on October 21, 2005.

IV.

*Analysis*

Defendant's summary judgment briefing addresses only one count of plaintiff's complaint, the 42 U.S.C. § 1983 discrimination claim. Plaintiff cannot base his § 1983 claim against the Board solely on the conduct of Hampton, McCloskey, Lovelace, or any other employee, as "a municipality cannot be held liable *solely* because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (emphasis in original).

Instead, plaintiff "must show that the School Board *itself* is the wrongdoer." *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996) (emphasis in original). To do so, plaintiff must "establish that an officially executed policy, or the toleration of a custom

13

within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Id.*

Plaintiff does not argue that the Board has a formally enacted policy of racism or religious intolerance. Instead, plaintiff's theory appears to be that the Board has a custom of failing to act to prevent discriminatory conduct. To state a *prima facie* case under an "inaction" theory, plaintiff must establish:

> 1. the existence of a clear and persistent pattern of discrimination by school employees;
>
> 2. notice or constructive notice on the part of the Board;
>
> 3. the Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> 4. that the Board's custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Id.* at 508. On many levels, plaintiff has failed to make out a *prima facie* case.

First, viewing the evidence before the court in the light most favorable to plaintiff, there is no genuine issue of material fact regarding "the existence of a clear and persistent pattern of discrimination by school employees." Plaintiff has cited no competent proof that any of the following events were related to his race, religion, or national origin: the football game expulsion; the key ring incident; the broken screen incident; the drug search (which, notably, H.M. himself termed a "mistake"); the soccer jersey incident; or Hampton citing two "friends" of E.M.'s (whose names E.M. can not even recall) for dress

14

code violations. Further, these events were sporadic and not a "clear and persistent pattern." Other incidents, such as the "brothers killing Americans" comment and the death threat, were conduct by students, not employees. Most striking, the circumstances surrounding E.M.'s withdrawal from the soccer team were, by H.M.'s own admission, quite likely the result of a longstanding feud between H.M. and McCloskey over matters wholly unrelated to race, national origin, or religion.

Similarly, plaintiff has raised no genuine issue of material fact regarding the discriminatory nature of Hampton and Lovelace's investigatory conduct. Hampton promptly investigated the death threat incident. Although plaintiff criticizes certain aspects of that investigation, he has cited no evidence that Hampton's response was not effective in stopping the threats.

More perplexing is H.M.'s May 2005 email. Therein, he complains about "targeting" and "downplaying" by school personnel in regards to E.M.'s safety. Specifically, H.M. criticizes Lovelace for: (1) responding to his concerns by asking E.M. if anyone has been intimidating him; and (2) questioning E.M. further ("Why am I getting calls from everyone telling me you are being intimidated") when E.M. *denied* experiencing any problems beyond a "few dirty looks." This is not evidence suggestive of discriminatory conduct - this is evidence of school personnel unable to satisfy a demanding parent no matter how hard they try. In sum, plaintiff has not shown a genuine issue of material fact as to the first element of his *prima facie* case, and for that reason alone summary judgment must be

15

granted.

Continuing to the second element of the *prima facie* case - Board notice - there is evidence that the soccer questionnaires were forwarded to the assistant superintendent, and that H.M. spoke to the Board in June 2005 regarding the drug search and Coach McCloskey. [H.M. dep., p. 73-74, 87]. While there is no evidence of any Board action taken in response to these notices, there is also no evidence of further searches, further problems with Coach McCloskey, or other similar issues that could be linked to Board inaction.[4]

Plaintiff has therefore not raised a genuine issue of material fact as to the Board's "deliberate indifference in their failure to act . . . amount[ing] to an official policy of inaction." Even "recklessly passive" school board performance is not enough to satisfy this standard. *Doe*, 103 F.3d at 508. "'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to" discrimination. *Id.* Further, without an official "custom," plaintiff obviously cannot make a *prima facie* showing of injury directly linked to official custom.

Lastly, the court is compelled to address plaintiff's minimal briefing in response to present motion. Plaintiff's legal argument and analysis, in its entirety, is as

---

[4] H.M.'s May and August 2005 complaint emails raise no genuine issue regarding Board notice. The emails were addressed to Hampton and school system employees, but plaintiff has offered no proof whatsoever as to the job functions of those other workers or their connection, if any, to the Board. Again, "evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue." 10A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727 (3d ed. 1998). It is further noteworthy that in plaintiff's summary judgment response, under the section captioned "Notice to the School Board," the only alleged notice cited was H.M.'s June 2005 Board meeting appearance.

16

follows.

> The Sixth Circuit has established a "supervisory liability" test where they have held that 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of respondeat superior. (As the Defendants argue). There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. *Bellamy v. Bradley*, 729 F.2d 416 . . . . Here, Vice-Principal Chris Hampton, one of the main people who picked on E.M., when asked at his deposition what his duties were, stated in relevant part: "I'm involved in all aspects of student life, discipline, attendance, academics. I serve in a leadership role . . . . I supervise a variety of areas throughout the school.

[Doc. 44, p. 18-19]. Plaintiff's reliance on *Bellamy* is wholly misplaced.

*Bellamy* was a case in which prison officials were sued in their *individual* capacities. *Bellamy v. Bradley*, 729 F.2d 416, 418, 421 (6th Cir. 1984). The supervisory liability discussion therein pertained to whether certain named individual capacity defendants could be held liable for the actions of their subordinates. *See id.* at 421.

Conversely, in the present case the issue of whether Hampton is or is not a "supervisor" is not dispositive. Unlike the individual capacity defendants in *Bellamy*, Hampton is not the ultimate defendant in this case. The Board is, and it is the Board's customs that are at issue. Plaintiff's citation to *Bellamy* is thus of no consequence.[5]

---

[5] Further, plaintiff's isolated and misplaced citation to *Bellamy* does not affect the court's analysis above regarding individual capacity liability. A case citation buried in a brief is not "clear notice" to Hampton and Lovelace that they have been sued individually.

17

V.

*Conclusion*

As noted above, the complaint in this case contains seven counts alleging seven distinct causes of action. Although defendants ask that this civil action be dismissed in its entirety, their summary judgment motion addresses only the § 1983 discrimination claim (count III).

Even though defendant has not moved for such relief, because summary judgment will be granted as to count III, summary judgment will also be granted as to the 42 U.S.C. § 1981 discrimination claim contained in count II. *See Arendale v. City of Memphis*, 519 F.3d 587, 598-99 (6th Cir. 2008) ("'[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981' . . .; no independent cause of action against municipalities is created by § 1981(c).") (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)).

However, summary judgment cannot be considered as to count I and counts IV through VII because defendant has not so moved. This civil action accordingly remains set for trial on those claims to commence November 9, 2009.

An order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan
United States District Judge